IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**UNITED STATES OF AMERICA**

v.                                                              Case No. 3:14cr122

**CLARENCE VERNON MOBLEY,
CHARLES NJIANDE,
and KENDAL D. WARREN,**

    **Defendants.**

## MEMORANDUM OPINION

Before the Court is Defendants Clarence Mobley, Charles Njiande, and Kendal Warren's Joint Motion to Suppress. (ECF No. 32.) The United States filed a response in opposition, and Defendants replied. (ECF Nos. 36, 37.) On November 5, 2014, the Court held a hearing on the pending motion. On November 19, 2014, the parties submitted final briefing in this matter. (ECF Nos. 43, 44.) Accordingly, this matter is ripe for adjudication. For the following reasons, the Court will deny the Joint Motion to Suppress.

### I. Procedural Background and Findings of Fact

#### A.     Procedural Background

On September 2, 2014, the grand jury returned a four-count indictment against Mobley, Njiande, and Warren. Count One charges each defendant with conspiracy to commit access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2–3) & 1029(b)(2). Count Two charges each defendant with access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2) & 1029(c)(1–2). Count Three charges each defendant with access device fraud, in violation of 18 U.S.C.

§§ 1029(a)(3) & (c)(1–2). Count Four charges each defendant with access device fraud, in violation of 18 U.S.C. §§ 1029(a)(4) & (c)(1–2).

On September 29, 2014, Defendants filed a Joint Motion to Suppress, arguing this Court must suppress the evidence against them because it was obtained pursuant to an unlawful traffic stop in violation of their Fourth Amendment[1] rights. (Defs.' Mot. Suppress 1, ECF No. 32.)

On November 5, 2014, the Court held a hearing on the Joint Motion to Suppress. Officer James Whitt testified for the United States, and Defendants Clarence Mobley and Charles Njiande testified for the joint defense. The United States introduced into evidence photographs of the scene of the alleged violation prompting the traffic stop, (Gov't Exs. 1–8), and the rental agreement for the car, (Gov't Ex. 9). The defense entered into evidence three photographs of the scene marked by witnesses, (Def. Exs. 1, 3, 4), and the police report filed by Officer Whitt following the stop, (Def. Ex. 2). Based on the evidence presented, the Court makes the following factual findings.

---

[1] Defendants initially challenged the search of the Buick following the stop, but later conceded they lacked standing to challenge that search. What remains is the Fourth Amendment challenge to the initial stop by Officer Whitt. The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

## B. Findings of Fact

At approximately 4:00 p.m.[2] on March 31, 2014, Colonial Heights Police Officer James S. Whitt was on patrol in an unmarked police vehicle, a Kia Sedona minivan, in Colonial Heights, Virginia. Lieutenant W.H. Anspach, Officer Whitt's supervisor, rode in the passenger seat of the minivan. Officer Whitt has been a police officer for over sixteen years, six of those with the Colonial Heights Police Department. During his last six years in the special operations or narcotics unit, Officer Whitt frequently has conducted drug interdiction work with Lt. Anspach. This can involve patrolling for and acting upon traffic violations. Officer Whitt regularly carries a summons book and a magistrate handbook with abbreviated versions of the traffic code, conducting between ten and twenty traffic stops per day when assigned to that duty.

---

[2] Officer Whitt consistently testified that the stop occurred at 4:00 p.m. This testimony remained unchanged when challenged on cross examination. (*See* Mot. Suppress Hr'g Tr. ("Hr'g Tr."), 34–35, Nov. 5, 2014, ECF No. 42 ("That's a busy intersection at 4:00 p.m."); Hr'g Tr. 72 ("Q: This was at, you say, 4:00 in the afternoon? A: Approximately, 4:00 p.m. Q: Could it have been closer to 1:00 p.m.? A: No it was in the later afternoon hours.").) Officer Whitt's report, written near the time of the incident, catalogs the time of the stop as "approximately 1601 hours." (Defs.' Ex. 2.) Mobley testified that the stop occurred after he had eaten lunch at approximately 1:00 p.m., while Njiande agreed on direct examination that the stop was in the "afternoon," (Hr'g Tr. 105).

Given Officer Whitt's demeanor, his experience, and the written report consistent with his testimony, the Court finds that the United States has established the time of the stop as 4:00 p.m. Mobley's contradictory testimony as to timing cannot be credited.

As Officer Whitt drove southbound on Southpark Boulevard on March 31, he neared the intersection of Southpark Boulevard and Roslyn Road.[3] At this intersection, southbound Southpark Boulevard is divided into three lanes. The left lane is designated as a left-turn only lane by white arrows on the road. The center lane contains straight white arrows on the road directing traffic to proceed straight through the intersection onto Interstate 95 northbound. The right lane is marked by a sign stating "Right Lane Must Turn Right" and two white arrows on the road indicating that the lane is for right turns only.

When Officer Whitt approached the intersection, driving in the center lane, he saw a late model black Buick sedan sitting at the yield sign in the far right lane on Southpark Boulevard. Officer Whitt testified that he travels this intersection frequently, at least once a week, and is "intimately familiar" with it and its signs. (Hr'g Tr. 47.) Officer Whitt testified that "when I first saw it, the vehicle was positioned slightly to the right as if it was making a right turn." (Hr'g Tr. 18.) During the hearing, Officer Whitt identified consistently the location of Mobley's Buick when looking at two photographic exhibits: "What appears to be a red Mustang in the front appears to be about where the vehicle I observed on March 31 was at a stop." (Hr'g Tr. 16, Gov't Ex. 6; *see also* Hr'g Tr. 17, Gov't Ex. 8 (Whitt identifying position of a "silver SUV").) Even when challenged on cross, Officer Whitt unwaveringly stated that the Buick sat at the intersection near the yield sign, as if to make a turn, when he first caught sight of the car. (Hr'g

---

[3] The record contains references to West Roslyn Road, while at least one sign depicted in the photographic exhibits indicates that a right turn at the relevant intersection would take a motorist onto East Roslyn Road. The same government photographs show that Southpark Boulevard allows both a left and right turn, suggesting that Roslyn crosses on both sides, east and west. No dispute exists as to the intersection at issue.

4

Tr. 32 ("I had not followed him down there at all . . . he was stopped at that location as I was traveling southbound.").) Officer Whitt's report, written near the time of the incident, parallels his testimony during the hearing: "I conducted the stop because . . . the vehicle was in the right turn late *at the traffic light* . . . ." (Defs.' Ex. 2) (emphasis added).[4]

Officer Whitt had received no communications earlier in the day regarding the Buick he ultimately stopped, including over the van's handheld radio. Officer Whitt testified that it was the turn signal from the Buick that caught his eye regarding the car in the first place. He stated that he observed the Buick "give a quick left turn signal and cut across" the solid white line designating the right-turn lane, partially entering the center lane of Southpark Boulevard and partially entering the intersection. (Hr'g Tr. 10, 18–20, 52.) Officer Whitt's report contains the same description: "[T]he vehicle was in the right turn lane at the traffic light and quickly gave a signal and crossed a solid white line to get into the South bound lane of travel for I 95 North Bound." (Defs.' Ex. 2.)

---

[4] Both Mobley and Njiande testified their car did not reach as far as the yield sign. (Hr'g Tr. 93–94, 96–97; Def. Ex. 3) (Mobley testifying that he was never at the yield sign); (Hr'g Tr. 107–08; Def. Ex. 4) (Njiande testifying that Mobley switched lanes "awhile before he got to the yield" and that he knew "for a fact it was before the yield"). Both Mobley and Njiande also testified that they were generally sure that the car changed lanes before the dotted line became solid. (Hr'g Tr. 95) (Mobley testifying that "[b]ecause it's a violation if you cross the white line," he "made [his] turn before the white line became solid"); (Hr'g Tr. 108) (Njiande testifying that the lane change had "most likely" been completed by the time the car reached the solid white line).

The Court cannot credit Mobley and Njiande's testimony over Officer Whitt's. Whitt's consistent testimony on direct examination and when challenged not only contained the ring of truth, it is confirmed by the report he wrote near the time of the incident. Mobley and Nijande, on the other hand, did not persuade the Court that – when listening to GPS instructions in an unfamiliar area – they both independently remembered with specificity pulling into the center lane at the exact moment when it would have been legal to do so. Given their demeanor when testifying, the nature of the testimony itself, and the potential for bias, the Court finds their testimony unduly self-serving.

Approximately six to ten cars sat in the right-hand lane behind the Buick. There were no cars in front of the officers' van in the center lane.[5] The first time Officer Whitt saw the Buick was from about four car lengths behind.[6] Officer Whitt observed at least two wheels of the Buick cross the solid white line. Officer Whitt had to let off his accelerator to avoid colliding with the Buick. Officer Whitt activated his emergency lights and pulled the Buick over on the on-ramp to Interstate 95. He stopped the Buick for an improper lane change[7] "[b]ecause of the arrows and the sign posted . . . . It could only turn right, which it did not do." (Hr'g Tr. 20.) He testified that "the left rear and the left front tire . . . crossed over the white line." (Hr'g Tr. 19.) Officer Whitt's report paralleled his testimony, stating that "[the Buick] was in the right turn lane

---

[5] Officer Whitt consistently testified there were no cars ahead of him in his lane and six to ten cars in the right lane behind the Buick. Mobley testified that the lane change was safe because the police car was "nowhere in sight," his was "the only car," and there were no cars behind him. (Hr'g Tr. 93.) Njiande testified that there were "no cars around" and "no cars in sight" and "no cars behind" the Buick when Mobley changed lanes. (Hr'g Tr. 107–09, 112–13.)

Again, the Court credits Officer Whitt's testimony over that of Mobley and Njiande. Whitt, who had significant familiarity with the location, credibly testified that the intersection, situated near the mall and the entrance ramps to north- and southbound Interstate 95, is a busy one, especially at 4:00 p.m. Whitt testified that "traffic normally gets bumper-to-bumper at that location." (Hr'g Tr. 52.)

In contrast, the defendants' description of a nearly empty Southpark Boulevard at the time of the stop did not ring true. Indeed, both Mobley and Njiande testified they did not see the officers' van until the on-ramp of Interstate 95. Mobley testified he first saw the officer when the Buick was "three-fourths" around the "turn leading to I-95 North," (Hr'g Tr. 103), and Njiande testified the Buick was on the on-ramp when he first became aware of the police vehicle. The Court finds the Defendants' failure to notice even an unmarked police vehicle during a stop comports more with a lack of attention to the road than it does with the careful observation they claim to have made about the lane markers on Southpark Boulevard.

[6] Officer Whitt later testified that the distance was four to six car lengths. No significant inconsistency exists among these statements.

[7] The Code of Virginia provides, in relevant part, that "[a] vehicle shall be driven as nearly as is practicable entirely within a single lane and shall not be moved from that lane until the driver has ascertained that such movement can be made safely." Va. Code Ann. § 46.2-804(2) (West 2014) ("Section 46.2-804(2)").

at the traffic light and quickly gave a signal and crossed a solid white line to get into the [s]outh bound lane of travel for I 95 [n]orth bound." (Def. Ex. 2.) In effectuating the stop, Whitt "considered all of it; him cutting across in front of me, as well as the traffic lanes, and the posted signs, and everything being in place." (Hr'g Tr. 60–62.)

Officer Whitt approached the Buick and observed Mobley in the driver's seat, Njiande in the front passenger seat, and Warren in the rear seat. Officer Whitt told Mobley that he had stopped the vehicle for an improper lane change and asked Mobley to produce his license. Mobley responded that he did not have his driver's license with him, but he identified himself to Officer Whitt by his date of birth and social security number. Officer Whitt requested the vehicle's registration. In response, Mobley confirmed that the vehicle was a rental car.[8] As Officer Whitt stood by the Buick immediately after the stop, all occupants confirmed the rental agreement did not authorize any of them to drive the car. Mobley told Officer Whitt that the rental agreement had been taken during a previous law enforcement encounter.[9] The authorized drivers on the rental agreement were Camille Robertson and Lavette Robertson. (Gov't Ex. 9.) Neither of the Robertsons were in the vehicle.

After determining that none of the occupants were authorized drivers, Officer Whitt asked Mobley to step out of the car and follow him back to the police vehicle. Whitt sent Mobley's information to the Department of Motor Vehicles ("DMV") while Mobley stood outside the police vehicle. When Whitt learned from the DMV that Mobley did not have a valid

---

[8] Inconsistencies exist surrounding when Mobley became aware the car was a rental. These discrepancies do not affect the Court's analysis.

[9] Inconsistencies also exist concerning whether Mobley stated he was present when the rental agreement had been taken. These differences present no material issue to the Court's analysis.

driver's license, Officer Whitt asked Mobley if he could pat him down.[10] Mobley agreed, stating that he had nothing on him except some credit cards. Officer Whitt then issued Mobley a summons for driving without a valid license, in violation of Va. Code Ann. § 46.2-300 (West 2014). Officer Whitt also issued Mobley a warning, but not a summons, for an improper lane change. Around this time, other officers arrived at the scene and, after contact with the car rental company, performed an inventory search of the car. The officers found a number of credit cards in the Buick that they believed to be fraudulent. Mobley was placed under arrest for credit card fraud. Whitt took the credit cards Mobley mentioned earlier from Mobley's pocket.

All three defendants were arrested and charged with identity theft, in violation of Va. Code Ann. § 18.2-186.3 (West 2014); credit card theft, in violation of Va. Code Ann. § 18.2-192 (West 2014); and credit card fraud, in violation of Va. Code Ann. § 18.2-195 (West 2014). After a federal grand jury returned the indictment in this case, the state charges were disposed of via *nolle prosequi*.

## II. Analysis

The Court finds that the United States has met its burden of proof to show by a preponderance of the evidence that Officer Whitt conducted the traffic stop based on a reasonable suspicion that a violation of the law occurred. Therefore, the Court will d the Motion to Suppress.

---

[10] Despite the fact that the testimony might be considered beneficial to Officer Whitt's case, he did not initially recall whether Mobley had agreed to a pat down. A review of his report refreshed his recollection that Mobley agreed to a pat down. Mobley did not contest the nature of the pat down, or the removal of any credit cards, during his testimony.

A. **Applicable Law**

1. **Fourth Amendment Seizure**

"The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted). It is well-settled that "[a]n automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). "'When an officer observes a traffic offense—however minor—he [or she] has probable cause to stop the driver of the vehicle.'" *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014) (quoting *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993)). "'[S]uch a stop must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct.'" *Id.* (quoting *Hassan El*, 5 F.3d at 729). The reasonable suspicion standard is "less demanding . . . than probable cause," and requires only "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (alteration in original) (citations omitted) (internal quotation marks omitted). To determine whether reasonable articulable suspicion exists, courts must look to the totality of the circumstances, including the information known to the officer at the time of the stop and any reasonable inferences to be drawn therefrom. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

"[I]f an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity."

9

*United States v. Kellam*, 568 F.3d 125, 136 (4th Cir. 2009) (quoting *Hassan El*, 5 F.3d at 730). An "officer['s] subjective intentions and motivations are irrelevant to the Fourth Amendment analysis." *United States v. Ellington*, 396 F. Supp. 2d 695, 699 (E.D. Va. 2005). No Fourth Amendment violation occurs when a "traffic stop [is] the prelude to . . . [an] arrest on charges wholly unrelated to the basis for the stop[,]" so long as the stop was supported by reasonable suspicion of criminal activity. *Whren*, 517 U.S. at 812.

### 2. The Burden of Proof on the United States

The United States bears the burden of establishing the admissibility of evidence obtained as the result of a warrantless search or seizure by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). A police officer may effectuate a traffic stop based on probable cause or reasonable suspicion of a violation of the law. *Williams*, 740 F.3d at 312. The United States need not present a prima facie case that a violation of the law actually happened, only the probability that a violation occurred. *United States v. Agee*, 168 F.3d 483, No. 98-4193, 1999 WL 11286, at *2 (4th Cir. Jan. 13, 1999) (citing *United States v. Spinelli*, 393 U.S. 410, 419 (1969)). Thus, the issue the Court must determine is not whether Defendants actually committed a violation of the law; the question is whether the United States has shown by a preponderance of the evidence that the officer who conducted the traffic stop had a reasonable belief, based on articulable facts, of unlawful conduct. *Id.*

### 3. Analysis of Credibility

To evaluate whether the United States has met its burden, the Court necessarily "must resolve conflicts in testimony, assess credibility, and draw conclusions." *United States v. Cucci*, 892 F. Supp. 775, 794 (W.D. Va. 1995). The testimony of the officer who conducted the traffic

10

stop is significant. The United States Court of Appeals for the Fourth Circuit has instructed courts to "credit[] the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). "Judicial review of the evidence offered to demonstrate reasonable suspicion must be . . . cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *Branch*, 537 F.3d at 337. However, despite crediting officers with their practical experience, the law also "supports an inquiry into the credibility of officers' testimony regarding the underlying justification for a traffic stop." *United States v. Harris*, No. 3:14cr07, 2014 WL 2475925, at *8 (N.D. W.Va. June 3, 2014).

### 4. Interplay Between Burden of Proof and Credibility

The Court should employ a credibility analysis and closely analyze the United States's burden of proof in all cases, but especially when police testimony is contradicted by other evidence.[11] Even when a defendant's "evidence raises a serious factual issue" as to whether a violation of the law actually occurred, *United States v. McGee*, 736 F.3d 263, 267 (4th Cir. 2013), it may be insufficient to mandate granting a motion to suppress if the court finds a police

---

[11] For example, in *United States v. Harris*, the district court denied the defendant's motion to suppress, finding two police officers credibly testified that the defendant's registration light was defective. 2014 WL 2475925, at *2, *10. The defendant offered testimony from his co-defendant that the car had been inspected two days prior to the stop and had no defective lights. *Id.* at *8. He also presented a receipt purporting to demonstrate the inspection, although the receipt had the wrong date and the wrong year of the car. *Id.*
Still, after weighing the credibility of the officers, and finding that the officers' testimony "aligned with [the] police report" and "did not waiver" in their belief that the light had been defective, the court found the United States met its burden to show by a preponderance of the evidence that the officers premised the traffic stop on probable cause of a traffic violation. *Id.* at *10. *But cf. Ellington*, 396 F. Supp. 2d at 700–01 (finding officers' testimony not credible where defendant's father testified that he had the car immediately inspected after the traffic stop, and inspector testified that all lights were working properly).

officer's "unwavering" testimony credible that he had reasonable suspicion that a violation occurred. *Ellington*, 396 F. Supp. 2d at 700. In its consideration, the Court should look to the consistency of a witness's testimony, *McGee*, 736 F.3d at 270–71; *Harris*, 2014 WL 2475925, at *3, *10, whether the testimony aligns with a previous recording such as a police report, *Harris*, 2014 WL 2475925, at *2, *10, whether the testimony is "self-serving," *Cucci*, 892 F. Supp. at 792, and whether testimony was refuted by other, stronger evidence, *see, e.g., Ellington*, 396 F. Supp. 2d at 700–01. The Court may also consider whether an important witness, such as an officer involved in the events surrounding a motion to suppress, failed to testify. *Cucci*, 892 F. Supp. at 792. As always, the Court must make its determination based upon the "totality of the circumstances." *Arvizu*, 534 U.S. at 273.

### B. The United States Met Its Burden to Show By a Preponderance of the Evidence that Reasonable Articulable Suspicion Justified the Initiation of the Traffic Stop and Did Not Violate the Defendants' Fourth Amendment Rights

#### 1. Officer Whitt Testified Credibly that He Had a Reasonable Belief, Based on Articulable Facts, of Unlawful Conduct

After weighing the evidence and evaluating the credibility of the testifying witnesses, the Court finds that Officer Whitt credibly testified that he reasonably believed he witnessed a violation of the law.

In its evaluation of Officer Whitt's testimony, the Court must first take note of his "practical experience." *Lender*, 985 F.2d at 154. The Court acknowledges that Officer Whitt testified that he had no formal training on the traffic code and could not name some traffic code sections from memory. However, he has been a police officer for over sixteen years. Officer Whitt carries a summons book and a magistrate handbook of traffic violations with him on

patrol, so while he may not be able to recite the laws, he remains informed and up to date.[12] As part of his current duties, he conducts ten to twenty traffic stops per day when on traffic patrol. Officer Whitt also has extensive experience with the area of the traffic stop. Officer Whitt has served as a police officer in Colonial Heights for at least the last six years, and he credibly testified that he is "intimately familiar" with the intersection at issue in this case.[13] (Hr'g Tr. 7, 47.) The Court finds that Officer Whitt's extensive practical experience with the traffic laws and the area lends significant credibility to his testimony.

The Court is unpersuaded that Officer Whitt conducted the stop with pretextual or ulterior motivations.[14] Although Officer Whitt confirmed on cross-examination that his work often involves drug interdiction, in which he looks for violations of law in order to conduct traffic stops in the hopes of obtaining consent or finding probable cause to search vehicles for drugs, he consistently testified that he only performs traffic stops for actual violations of the law.

---

[12] *Cf. Hassan El*, 5 F.3d at 730 (finding no Fourth Amendment violation because reasonable suspicion existed to execute a traffic stop for a violation of failing to stop at a stop sign even though the officers did not carry a summons book and conceded they did not intend to give the driver a ticket for the violation).

[13] In contrast, Mobley was unfamiliar with the area and operated the car only with guidance from the GPS system. Njiande, too, was unfamiliar with the area and testified that he was not paying attention to the road prior to the stop. Mobley and Njiande's lack of familiarity with the area detracts from their version of the events.

[14] So long as a stop is supported by reasonable suspicion or probable cause, any alleged pretext is irrelevant to a Fourth Amendment analysis. *Ellington*, 396 F. Supp. 2d at 699. The test for assessing whether a stop was pretextual is an objective one: "'if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity.'" *Kellam*, 568 F.3d at 136 (quoting *Hassan El*, 5 F.3d at 730).

This testimony here plainly shows the stop began when the Buick, four cars ahead, made an improper lane change and not for a pretextual reason. This Court finds wholly credible Officer Whitt's testimony that he had no prior information about the Buick on March 31, 2014, and that he did not see the car until it activated its turn signal and began its lane change. Although, on cross-examination, he acknowledged that the normal "profile" of narcotics traffickers around Southpark Mall involves "young college kids," Officer Whitt credibly testified that it was only the Buick's turn signal that caught his eye. (Hr'g Tr. 52, 64.) Given that he was four car lengths back and the Buick was stopped with cars behind it upon the initial sighting, the record amply establishes that Officer Whitt did not see the age or race of the driver until after he had begun executing the traffic stop. It was not until he was on the on-ramp to Interstate 95 that he could see the appearance of the passengers. The Court is unpersuaded that Officer Whitt conducted the traffic stop for any reason other than his reasonable belief that he witnessed a traffic violation.[15]

The evidence presented, and the credibility thereof, must be viewed within the lens of the applicable burden of proof. While it rests with the United States, the burden is significantly lower than that required to demonstrate that the Defendants actually committed an improper lane change. The United States need only demonstrate by a preponderance of the evidence that Officer Whitt reasonably believed that he observed a violation of the law. *See Ellington*, 396 F.

---

[15] In making its findings above, the Court acknowledges that Officer Whitt did not offer polished testimony. As indicated above, he could not recall the traffic code violation for improper lane change – the basis for the stop – nor the section for failure to obey traffic signals. He did not claim significant *training* in traffic laws, but he did contend he had significant experience in conducting traffic stops. Like Officer Whitt's inability to recall initially whether Mobley agreed to the pat down, these admissions added as much to the officer's credibility as they detracted from them. Pivotally, his testimony regarding the basis for the initial traffic stop remained consistent with that written in his report. It had the ring of truth.

14

Supp. 2d at 699. Officer Whitt, an experienced police officer, consistently testified that he first saw the Buick stopped at the yield sign. His testimony, confirmed by his report, was unwavering that from approximately forty feet away, he witnessed at least two wheels of the Buick cross the solid white line separating the lanes of traffic, that this action constituted a violation of the law, and that the action was unsafe because he had to let off his accelerator to avoid hitting the Buick.[16] Mobley and Njiande's testimony, while relatively consistent, and perhaps conveniently consistent, with one another, did not ring true given the nature of the testimony itself and their unfamiliarity with the area.[17] The Court finds that the United States met its burden to show that a probability exists that Mobley committed a traffic violation by changing lanes improperly, and that Officer Whitt reasonably believed that Mobley did so.

---

[16] The Court remains perplexed as to why the United States did not also offer the testimony of Lt. Anspatch regarding the traffic stop. The Court may consider the failure of a witness to testify in its credibility analysis when that witness played an "instrumental role" in the events. *Cucci*, 892 F. Supp. at 792. However, unlike the agent in *Cucci* who obtained the contested search consent forms at issue but did not testify, Lt. Anspatch does not appear to have been able to offer testimony critical to the nature of the stop that would not have been potentially cumulative.

[17] Moreover, for the reasons noted above, the Court finds the alternative version of events offered by defendants Mobley and Njiande incredible. While the Court would not discount Defendants' testimony merely based on the fact that it is "self-serving," *Cucci*, 892 F. Supp. at 792, it must note that Defendants have an obvious reason to testify in their own favor. The detail with which they recalled aspects of the lane change did not comport with their lack of attention to a police vehicle instigating a traffic stop. When compared to the unwavering specificity offered by Officer Whitt, the Court cannot find that Mobley and Njiande credibly testified that Southpark Boulevard had no cars in the vicinity when Mobley changed lanes. Officer Whitt's van clearly was nearby. Finally, the fact that Mobley and Njiande were largely consistent with each other as to those events does not persuade: they share a potential bias and, as permitted by the procedural rules, Njiande was allowed to hear Mobley testify before he offered his own version of events.

## 2. The Conduct Officer Whitt Observed Provided Reasonable Suspicion of a Violation of Section 46.2-804(2)

Finding Officer Whitt's testimony credible, the Court must determine "what conduct is prohibited by" Section 46.2-804(2), and whether Officer Whitt's observations of Mobley's conduct could provide reasonable suspicion that Mobley violated this statute.[18] The Court finds that the conduct observed by Officer Whitt provided reasonable suspicion of unlawful conduct in violation of Section 46.2-804(2).

---

[18] Defendants argue Officer Whitt committed a mistake of *law* by citing Mobley for an "improper lane change" but failing to cite to the specific code section and for misinterpreting the "safety" requirement in the lane change statute. (Def. Brief at 7–10.) Defendants' arguments lack merit. Defendants mischaracterize the definition of a "mistake of law" and misinterpret the improper lane change statute.

Most United States Courts of Appeals hold that a mistake of law, however reasonable, cannot support probable cause. *See, e.g. United States v. McDonald*, 453 F.3d 958, 961 (7th Cir. 2006) ("We agree with the majority of circuits to have considered the issue that a police officer's mistake of law cannot support probable cause to conduct a stop.") While the Fourth Circuit has not directly addressed the issue, it has indicated its inclination to follow the majority rule. *See Williams*, 740 F.3d at 312 (citing *McDonald* for the proposition that "a police officer's mistake of law [cannot] support probable cause to conduct a stop when the underlying conduct was not, in fact, illegal"); *see also United States v. Davis*, 692 F. Supp. 2d 594, 600 (E.D. Va. 2010).

A mistake of law occurs when an officer conducts a stop or seizure "based on a subjective belief that a law has been broken, when no violation actually occurred." *McDonald*, 453 F.3d at 962. The significant phrase in this definition is "when no violation actually occurred." A police officer's reliance on an incorrect statute does not negate probable cause if the conduct supporting probable cause is actually illegal under another statute. *See Williams*, 740 F.3d at 313 (finding no mistake of law when defendant's conduct did not violate the law cited by the police officer but did violate a "closely related" code provision). Further, "a police officer's inability to identify the correct code section at the time of a stop does not undermine valid probable cause or reasonable suspicion that a driver violated a traffic law." *Id.* at 312.

Here, Officer Whitt executed a traffic stop of the Buick based on an improper lane change. He told Mobley this was the basis for the stop when he pulled him over, (Hr'g Tr. 20–21), wrote "improper lane change" as the basis for the stop in his report, (Def. Ex. 2), and maintained that Mobley's "improper lane change" was the basis for the stop throughout the hearing, (Hr'g Tr. 20, 29, 56, 60, 62, 66). Officer Whitt's inability to recite the code during the suppression hearing does not negate his observations of conduct he believed to be a violation of the law. Moreover, as noted above, this Court determines that the conduct at issue suggested at least reasonable suspicion of a violation of Section 46.2-804(2).

16

The Code of Virginia provides that "[a] vehicle shall be driven as nearly as is practicable entirely within a single lane and shall not be moved from that lane until the driver has ascertained that such movement can be made safely." § 46.2-804(2). This court recently analyzed Section 46.2-804(2) and found that a single instance of even touching a boundary line provides reasonable suspicion to effectuate a traffic stop. *United States v. Williams*, 945 F. Supp. 2d 665, 672 (E.D. Va. 2013) (addressing the same code section in an analogous failure to maintain a single lane violation). The *Williams* court found "a lane of travel by definition constitutes the area *between* the boundary lines (the fog lines) on each side of the lane," and "a driver who drives his vehicle on the boundary line violates § 46.2-804." *Id.* Therefore, even a brief touching of the lines would not constitute driving "entirely within" a single lane as required by the statute. *See id.* The *Williams* court held that the officer did not violate the defendant's Fourth Amendment rights when the officer stopped the vehicle under Section 46.2-804(2) where the defendant briefly drove on top of the white fog line at the side of the road. *Id.* at 673. *Williams* and similar cases make clear that courts within the Fourth Circuit find reasonable

suspicion of a violation for even a single instance of touching or crossing a lane's boundary lines.[19]

Here, Officer Whitt consistently testified that he observed the Buick drive from a lane clearly designated as a right-turn only lane, separated by a solid white line, partly into the lane of traffic proceeding southbound and partly into the intersection. Officer Whitt did not deviate from this testimony that he observed at least two wheels of the Buick cross the solid white line separating the lanes. Taking into account the credibility of the witnesses, the evidence presented, and the totality of the circumstances, Officer Whitt's observation of the vehicle taking such action provided at least reasonable suspicion that the vehicle was not driven "entirely within a single lane" as required by Section 46.2-804(2). *See Williams*, 945 F. Supp. 2d at 672. Accordingly, the United States met its burden to show by a preponderance of the evidence that

---

[19] *See, e.g. United States v. Gallardo-Gonzalez*, 331 F. App'x 255, 256–57 (4th Cir. 2009) (interpreting N.C. Gen. Stat. § 20-146(d)(1), a statute essentially identical to Section 46.2-804(2) and finding that even one instance of failing to maintain the driver's lane of travel provided a readily observable traffic violation sufficient to justify a traffic stop).

Defendants argue that the statute requires an inquiry into whether "Mobley, in his mind, could have safely made the lane change." (Def. Brief at 8, ECF No. 44.) Case law precludes this interpretation of the statute, because it is clear that a single instance of crossing a boundary line alone can violate the statute, regardless of safety concerns. *See, e.g., Williams*, 945 F. Supp. 2d at 672–74 (collecting cases). In any event, despite Mobley's testimony otherwise, the facts support a finding that Officer Whitt had reasonable suspicion that the lane change violated the statute, because Officer Whitt specifically testified that the Buick "cut across" in his lane of traffic, (Hr'g Tr. 10), he had to let off his accelerator to avoid hitting the Buick, and he believed the lane change was "unsafe." (Hr'g Tr. 23, 60–62, 66). The Court finds Whitt's testimony even more persuasive because he did not overstate the circumstances by claiming that Mobley's move was reckless.

the traffic stop was supported by at least reasonable suspicion and therefore was constitutionally proper.[20]

Officer Whitt stopped the Defendants' Buick based on reasonable suspicion of a violation of Section 46.2-804(2). After learning that Mobley did not have his driver's license, Officer Whitt had Mobley step out of the vehicle. He conducted an appropriate, and unchallenged, pat down of Mobley, during which Mobley volunteered that "the only thing he had on him [were] some credit cards in his pocket." (Hr'g Tr. 24.) Officer Whitt did not take the cards at that time. He ran Mobley's information through the DMV, and, based on the information received, appropriately issued Mobley a summons for driving without a license.[21] Subsequently, other officers conducted an unchallenged search of the vehicle[22] and uncovered multiple fraudulent credit cards. Only after Defendants were placed under arrest for credit card fraud did Officer

---

[20] Even though the Court does not base its decision on this finding alone, the Fourth Circuit's *Williams* decision would allow a finding here that Officer Whitt also had reasonable suspicion to stop Mobley's Buick for the closely related violation of failure to obey traffic control devices when Mobley quickly left his stopped position in the right turn lane to cross the intersection in a different lane instead. *See* Va. Code Ann. § 46.2-830 (West 2014); *Williams*, 740 F.3d at 313.

[21] Officer Whitt also issued Mobley a warning for the improper lane change. Officer Whitt's decision not to issue a summons on the violation which provided him with reasonable suspicion for the stop does not constitute a Fourth Amendment violation. *Whren*, 517 U.S. at 812; *United States v. Wingle*, 565 F. App'x 265, 269 (4th Cir. 2014) ("An officer's exercise of discretion in making charging decisions has no impact on whether reasonable suspicion existed at the time of the stop.").

[22] Defendants here correctly recognize that they do not have standing to challenge the search of the rental vehicle they were not authorized to operate. *See, e.g., United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) (noting that an individual may assert a Fourth Amendment challenge only to a place in which he or she has a legitimate expectation of privacy, and finding that an operator or passenger of a rental vehicle has no such legitimate expectation of privacy in a rental vehicle without authorization from the rental company to operate that vehicle).

Whitt take the credit cards from Mobley's person. The seizure did not violate Defendants' Fourth Amendment Rights.

### III. Conclusion

For the foregoing reasons, the Court will deny the Defendants' Joint Motion to Suppress. (ECF No. 32.)

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: 11/25/14